UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at Chattanooga

| | |
|---|---|
| In the Matter of the Application of the United States Of America for a Search and Seizure Warrant for the Premises Known and Described as 5895 Waterlevel Highway, Cleveland Tennessee 37323 and Any Closed and locked Containers/Items Contained Therein | **TO BE FILED UNDER SEAL**<br><br>**Agent Affidavit in Support of Application for Search and Seizure Warrant**<br><br>/:17 - MJ-100 |

LUIGI STOLFA, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1. I am a Special Agent with the United States Department of Agriculture Office of Inspector General (the "Investigating Agency" or "USDA"). As such, I am a federal law enforcement officer within the meaning of Rule 41 of the Federal Rules of Criminal Procedure. I have been a special agent for approximately eight years. Prior to joining USDA, I served as an intelligence specialist with the United States Navy. I have participated in the execution of search warrants of physical premises, and have participated in the execution of search warrants involving electronic devices.

2. I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject Premises") for, and to seize, the items and information described in Attachment A. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers and cellular telephones ("smart phones") in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not

1

include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B. The Subject Premises**

3. The Subject Premises are particularly described as the house, detached tan garage and workspace, and any chicken barns, coops, or sheds contained on the lot located at 5895 Waterlevel Highway, Cleveland, Tennessee 37323. A photograph detailing the subject premises is contained in Attachment A and is incorporated by reference herein.

**C. The Subject Offenses**

4. For the reasons detailed below, I respectfully submit that there is probable cause to believe that the Subject Premises contain evidence, fruits, and instrumentalities of violations of Title 7, United States Code, Section 2156 and conspiracy to violate the same (prohibiting, among other things, the buying, selling, delivering, or transporting of sharp instruments for use in an animal fighting venture) (the "Subject Offenses").

## II. Probable Cause

**A. Probable Cause Regarding Subjects' Commission of the Subject Offenses**

5. Based on my training and experience in animal cruelty investigations, I have learned the following in regards to the activity known as "cockfighting." As its name suggests, cockfighting is an activity in which two roosters are put forward to fight against one another. The roosters may have metal spurs, known as gaffs, affixed to their legs for use in the fight. Pursuant to Title 7, United States Code, Section 2156(e), it is unlawful "for any person to knowingly sell, buy, transport, or deliver in interstate or foreign commerce a knife, a gaff, or any other sharp instrument attached, or designed or intended to be attached, to the leg of a bird for use in an animal fighting venture."

2

6. In conjunction with the New York City Police Department's ("NYPD") Animal Cruelty Investigations Squad, the USDA is currently conducting an investigation of cockfighters and cockfighting breeders nationwide. Among other individuals, two Target Subjects of this investigation are: (1) TOMMY CARRANO, the president of the New York chapter of the United Gamefowl Breeders Association, also known as the "UGBA," and (2) DWIGHT ORR, an individual who I believe resides at the Subject Premises and who, as set forth below, appears to operate an illegal business selling cockfighting implements.

7. On or about December 28, 2016, the Honorable Barbara Moses, United States Magistrate Judge for the Southern District of New York, authorized a search warrant for seven Facebook accounts, including two Facebook accounts associated with TOMMY CARRANO ("the Carrano Search Warrant"): the accounts with user names "nyugba.nyugba" (the "NYUGBA Account") and "tommy.carrano" (the "Carrano Account"). Based on my review of the returns from the Carrano Search Warrant and my training and experience, it appears that CARRANO has used both Facebook accounts. In particular, CARRANO has sent messages identifying himself by name and as the president of the New York chapter of the UGBA.

8. Based on my review of the returns from the Carrano Search Warrant, I have learned the following, in substance and in part:

    a. In or about June 2016, the NYUGBA Account exchanged the following private messages with a Facebook Account ("Facebook Account-1"):

> Facebook Account-1: I was talking to Travis about gettin a set of short heels an he said he got a set from you that Dwight Orr made and was very good quality spurs, do you think you could have him make me a set of short heels?
>
> Carrano: Not a problem Cody.
>
> Facebook Account-1: Awesome, I'd like 1 1/2, just let me no what I need to do

3

Facebook Account-1: How much does mr. Orr charge for a set

Carrano: Hello Cody I think I paid hundred and 25 for a set

Carrano: I am glad you remided me

Facebook Account-1: Ok are they one piece? And have u ever had a problem with them breaking?

Carrano: They are one piece never a problem

Facebook Account-1: Ok I broke one last weekend n the drag and that was a sick feeling, what do I need to do to get the money to him?

Carrano: I will call him tonight.

Facebook Account-1: Ok thank you

Carrano: Hello Cody Dwight orr 423 476 5101 just tell him you are a friend of Tommy Carrano president of NY and highly recommended his collectibles.

Based on my training, experience, and participation in this investigation, it appears that the foregoing is a conversation between TOMMY CARRANO and an individual about purchasing different types of gaffs ("short heels"/ "1 ½") from DWIGHT ORR.

    b. In or about March 2016, the NYUGBA Account exchanged the following private messages with a Facebook Account ("Facebook Account-2"):

Carrano: Nice they can get down in them pegawls

Facebook Account-2: I'm going to get some we usually test for 5 days but I want try using pegawls

Carrano: For me that is the only way for gameness Dwight orr makes mine and I like them

Facebook Account-2: I know Dwight I'll get him too make me some

Facebook Account-2: I used to show in inch and half fast heels its my favorite but it's not around here anymore

Carrano: John I sent him the pattern from the Marsh family I would suggest you ask him for those

4

Facebook Account-2: „good deal I will

Based on my training, experience, and participation in this investigation, it appears that the foregoing is a conversation between TOMMY CARRANO and an individual about purchasing different types of gaffs ("inch and a half fast heels"/ "pegawls") from DWIGHT ORR.

9. On or about May 23, 2017, pursuant to a judicially-authorized search warrant, law enforcement officers conducted a search of a residence belonging to CARRANO. Law enforcement recovered from the residence, among other items, several pairs of gaffs, including a pair of gaffs engraved with the initials "D.O." Based on my involvement in this investigation, I believe that the initials "D.O." stand for DWIGHT ORR and indicate that the gaff was manufactured by ORR.

**B. Probable Cause Justifying Search of the Subject Premises**

10. On or about May 25, 2017, law enforcement officers conducted surveillance of the Subject Premises. Based on my discussions with those officers, and my review of surveillance photographs, I have learned the following: The Subject Premises consists of what appears to be a house with a detached tan garage and workspace. Behind the house, there appear to be, based on my training and experience, small coops for use in raising and maintaining chickens. Based on my training and experience, it is common for individuals involved in the Subject Offenses to maintain their own supply of gamefowl for sale and for use in cockfighting.

11. Based on my review of public records, and of www.usaopps.com,[1] I have learned the following: "Dwight Orr Metal Shop" is listed as a "Certified Small Disadvantaged Business" and is located at the Subject Premises. The Dwight Orr Metal Shop maintains a North American

---

[1] www.usaopps.com is a website that provides small and medium-sized businesses with information regarding federal, state, and local government contracting opportunities.

5

Industry Classification System Code for sheet metal work manufacturing. Accordingly, it appears that ORR operates a sheet metal manufacturing facility from the Subject Premises.[2]

12. Based on my review of law enforcement databases, it appears that the Tennessee Gamefowl Breeder's Association, Inc. is incorporated at the Subject Premises. Based on my training and experience, and my involvement in this investigation, *see supra* ¶¶ 6–9, I know that state gamefowl breeder associations are often comprised of individuals involved in cockfighting and serve as a conduit for information regarding cockfighting. In addition, based on my training and experience, I know that state gamefowl breeder associations often maintain records regarding membership, events, newsletters, rooster sales, and other types of documents.

13. On or about May 23, 2017, pursuant to a judicially-authorized search warrant, law enforcement officers recovered what appears to be a business card for ORR (the "ORR Business Card") from the residence of CARRANO in Rochester, New York. The ORR Business Card lists the Subject Premises as the business address and lists a phone number ("ORR Phone Number"). A copy of the ORR Business Card is set forth below:

---

[2] Based on my review of law enforcement databases, it appears that the ORR metal shop was at one point also listed as being located at 5841 Waterlevel Highway with an ownership address of the Subject Premises.

6

Case 1:17-mj-00100-CHS   Document 2   Filed 06/05/17   Page 6 of 16   PageID #: 7



As discussed above, *see supra* ¶ 5, a gaff is a sharp metal object affixed to a rooster for use in cockfighting. The possession, manufacture, and distribution of gaffs for use in cockfighting is in violation of the Subject Offenses, *see* 7 U.S.C. § 2156(e). Accordingly, it appears that ORR manufactures gaffs for sale and operates this business out of the Subject Premises as part of the Subject Offenses. Moreover, based on the email address provided on the ORR Business Card, it appears that ORR uses electronic mail as a means to communicate with customers regarding the Subject Offenses.

      14.    On or about June 2, 2017, a confidential informant ("CI")[3] participated in a recorded call with the ORR Phone Number. During the call, an individual identified himself as "Dwight." The CI placed an order for at least one pair of gaffs from "Dwight" and agreed to send a money order to the Subject Premises in exchange for the gaffs. Accordingly, it appears that ORR is still engaged in the Subject Offenses and continues to operate out of the Subject Premises.

---

[3] The CI is not receiving compensation for any assistance provided to law enforcement. Rather, the CI is cooperating with law enforcement in hopes of receiving some leniency with respect to criminal charges filed against him. The CI has provided reliable information to law enforcement previously and has been corroborated by, among other things, information obtained from social media search warrants.

15. Based on my training and experience, it is common for individuals involved in the manufacturing and distribution of gaffs, like any small business, to keep records regarding their participation in such ventures. Specifically, it is common for such individuals to keep ledgers and other papers documenting their receipt of orders, prices, invoices, shipping details, production orders, customer lists and other documentary records, including both physical documents and electronic records.

16. As noted above, *see supra* ¶ 10, it appears that ORR maintains chickens at the Subject Premises. Based on my training and experience, and my involvement in this investigation, individuals involved in the Subject Offenses often store records relating to the raising, grooming or training of gamefowl, including records relating to the purchase, sale, and competitive success of their gamefowl; literature and other paraphernalia related to cockfighting, including magazines. Such evidence is especially likely to be found in situations, such as here, where the individual appears to maintain chickens at the location. Indeed, based on my training and experience, I know that individuals involved in the breeding of roosters for purposes of cockfighting often maintain records relating to the lineage and breed of the roosters in their possession. Certain lineages of roosters are especially prized for their ability as fighters and careful documentation is necessary to ensure proper bloodlines. In addition, breeders may also keep records relating to prior cockfighting results in order to better market their roosters for sale. These records may include physical items such as ledgers, as well as electronic records such as spreadsheets, photographs, and videos.

C. **Probable Cause Justifying Search of ESI**

17. Based on my training and experience, I know that individuals who engage in the Subject Offenses commonly use computers, cellular telephones ("smart phones") and other electronic devices to communicate with co-conspirators online; keep track of co-conspirator's

8

contact information; keep a record of illegal transactions or criminal proceeds for future reference. As a result, they often store data on their computers, smart phones and other electronic devices related to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; and/or records of illegal transactions or the disposition of criminal proceeds. This is especially likely in situations, like here, where an individual has advertised their use of an electronic means of communication as part of the Subject Offenses, *see supra* ¶ 13.

18. Based on my training and experience, I also know that, where computers are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred. This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

19. Based on the foregoing, I respectfully submit there is probable cause to believe that ORR is engaged in the Subject Offenses, and that evidence of this criminal activity is likely to be

9

found in the Subject Premises and on computers and electronic media found in the Subject Premises in the forms specified in Attachment A, which is incorporated by reference herein.

### III. Procedures for Searching ESI

#### A. Execution of Warrant for ESI

20. Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices, smart phones and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

21. As discussed herein, the Dwight Orr Metal Shop (the "Company) appears to be a functioning company that appears to conduct legitimate business. The seizure of the Company's computers, smart phones or other storage media may limit the Company's ability to conduct its legitimate business. In order to execute the warrant in the most reasonable fashion, law

10

enforcement personnel will attempt to investigate on the scene of what computers or storage media must be seized or copied, and what computers or storage media need not be seized or copied. Law enforcement personnel will speak with Company personnel on the scene as may be appropriate to accomplish this. Where appropriate, law enforcement personnel will copy data, rather than physically seize computers, to reduce the extent of any disruption of the Company's business operations. If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continued functioning of the Company's legitimate business. If, after inspecting the seized computers off-site, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the Government will return it. In any event, agents conducting the search of digital media will endeavor to do so in a manner which will cause the least amount of disruption to any legitimate business interest.

### B. Review of ESI

22. Following seizure of any computer devices, smart phones and storage media and/or the creation of forensic image copies, law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

23. In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

11

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[4]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

24. Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

C. **Return of ESI**

25. If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of

---

[4] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

## IV. Conclusion and Ancillary Provisions

26. Based on the foregoing, I respectfully request the Court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

LUIGI STOLFA
Special Agent
United States Department of Agriculture

Sworn to before me on
June 5, 2017

HON. CHRISTOPHER H. STEGER
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### I. Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein: the house, detached tan garage and workspace, and any chicken barns, coops, or sheds contained on the lot located at 5895 Waterlevel Highway, Cleveland, Tennessee 37323.



### II. Items to Be Seized

#### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of violations of Title 7, United States Code, Section 2156 and conspiracy to violate the same (the "Subject Offenses") described as follows:

1. Evidence concerning occupancy or ownership of Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, diaries, statements, identification documents, address books, telephone directories, and keys.

2. Evidence concerning the identity or location of, and communications with co-conspirators involved in the Subject Offenses;

2017.03.18

3. Evidence concerning the raising and breeding of chickens and gamefowl as part of the Subject Offenses, including medical supplies, food, grooming equipment, and documentary records concerning lineage or bloodlines;

4. Evidence concerning the use of gamefowl in cockfighting including gamefighting paraphernalia and cockfighting literature;

5. Evidence concerning the manufacture, sale, and distribution of gaffs, including gaffs, gaff-making equipment, ledgers, documents, customer lists, mailing records and/or receipts, records, pictures, videos, news reports, and awards; and

6. Evidence concerning the sale, purchase or shipment of roosters or other chickens for use as part of the Subject Offenses;

7. Evidence concerning any records relating to the raising, grooming, and/or training of gamefowl in connection with the Subject Offenses; and

8. Evidence concerning the sale, purchase, or shipment of roosters or other chickens for use in or in furtherance of the Subject Offenses;

### B. Search and Seizure of Electronically Stored Information

The items to be seized from the Subject Premises also include any computer devices, smart phones and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, desktop and laptop computers, disk drives, modems, thumb drives, personal digital assistants, smart phones, digital cameras, and scanners. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from the Subject Premises also include:

1. Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2. Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3. Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

### C. Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under

2

government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.